NOT DESIGNATED FOR PUBLICATION

No. 118,333

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
R.E.R., K.C.S., and R.L.S.,
Minor Children.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed April 13, 2018. Affirmed.

*Michael J. Nichols*, of Michael J. Nichols P.A., of Kansas City, for appellant natural mother.

*Ashley Hutton*, assistant district attorney, and *Mark A. Dupree, Sr.*, district attorney, for appellee.

Before GARDNER, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM: Ro. S. (Mother) appeals the termination of her parental rights alleging there "was not clear and convincing evidence that reasonable efforts were made to rehabilitate the family." Our review of the record reflects extensive efforts by KVC Behavioral Healthcare, Inc. (KVC) and the related professionals to rehabilitate the family. Mother continually challenged her daughter's story and refused to adjust her living conditions and responsibilities to meet the needs of her children. We affirm.

FACTS

On May 10, 2016, R.E.R. went to school with a busted lip and blood on her jacket. She alleged her mother hit her in the head with a cell phone and also hit her in the mouth. R.E.R. had numerous healing bruises on her face, and she told a Department for Children

1

and Families (DCF) worker she was afraid to go home to Mother because she thought she would be hit again. R.E.R.'s school reported observing her with other injuries in the past, and school records reflect she had missed 49 days of school. R.E.R. was placed in police protective custody. Mother allegedly told family members she planned to take R.E.R. and her other two children out of the state to keep DCF "out of her business."

On May 18, 2016, the State filed petitions alleging R.E.R. and her siblings, K.C.S., and R.L.S., were children in need of care. The district court agreed, finding the children were in immediate danger of harm and placed them in temporary custody of DCF.

On August 9, 2016, Mother and the fathers stipulated all three children were children in need of care. The district court set out custody of the children and the parents' duties during the pendency of the case. KVC had discretion over the parents' visitation, and the parents were ordered to:

- obtain stable housing;
- obtain verifiable stable income;
- obtain a psychosocial evaluation and to follow the recommendations; and
- sign any necessary releases of information.

The district court ordered Mother to:

- obtain a mental health assessment and follow its recommendations;
- obtain a Safe Kids assessment and follow any recommendations;
- obtain a psychological assessment and follow its recommendations;
- submit to random, negative drug tests, and if the random UA's are not negative, obtain a drug and alcohol assessment and follow its recommendations; and
- participate in family therapy with R.E.R.

2

The court later required Mother to participate in individual therapy.

Mother completed a mental health assessment in June 2016 at Wyandot Center For Community Behavioral Healthcare. She reported she did not have any mental health history and denied past or current diagnoses. Mother's case services officer and the professionals from KVC thought Mother was not truthful during the assessment. Mother currently receives social security disability benefits for bipolar disorder. Mother also had an inpatient psychiatric stay at the University of Kansas Medical Center for depression and anxiety in August 2016. Mother claimed when she scheduled a Safe Kids assessment "she would 'say no to everything, like I did for the other one' (referring to the mental health assessment)."

Mother submitted multiple positive drug tests. Her first drug test in August 2016 was positive for cocaine. She failed or refused to submit to her next five drug tests for multiple reasons. In February 2017, Mother provided a diluted, untestable urine sample and also admitted she had taken an unprescribed Oxycodone. She did not show up at her next appointment. Her final test was positive for methamphetamine and amphetamine. The district court ordered a drug test during a recess at the termination hearing and the test was positive for marijuana. Mother admitted she had used marijuana the prior weekend. Mother's case manager, Rachel Stompoly, provided Mother with information regarding a RADAC (drug and alcohol) assessment on five occasions. Mother told Stompoly she did not believe she had a drug problem. Mother never provided verification she completed the assessment.

Mother's visits with her children were troubling. She "openly admitted that K.[C.]S. is her favorite child and . . . announced that she brings him more toys and candy . . . because of this." R.E.R. reported "her mom was 'mean during visits and teases her.'" When asked how she felt about visits with her Mother, R.E.R. said she felt "scared. Sometimes I don't want to go, but sometimes I do because I think that she might be nice."

Mother told R.E.R. it was R.E.R.'s fault the children were in foster care. During one visit, Mother told the KVC worker that K.C.S. and R.L.S. could come home and R.E.R. could stay in foster care. The worker told Mother it was inappropriate to make such comments in front of the children.

Mother's aggressive actions also caused two foster placements for the children to end. The first foster parent reported Mother was aggressive towards her when she dropped the children off and was worried Mother was stalking her home. Mother threatened the second foster parent when she picked up the children from KVC. Mother waited for the foster parent to arrive, approached her and the children, and began yelling at the foster parent telling her she was abusing the children and not feeding them. Mother took photos of the foster's parent's license place and told her she would find her and "beat her up."

Mother and R.E.R. engaged in family counseling with Lauren MacPherson, a therapist at KVC. Initially, Mother refused to participate in family counseling but later agreed. Mother then told MacPherson she would not participate because she did not believe R.E.R. thought Mother was being mean to her and Mother did not "'want baby therapy.'"

The family counseling sessions concerned MacPherson. In one session, Mother took a phone call and said inappropriate things in front of R.E.R., including using vulgar language. In the same session, Mother asked R.E.R. to reveal the address of her foster mother and tell her what school R.E.R. was attending. R.E.R. cried for most of the session. In a different session, Mother became upset and told R.E.R. she would leave her in foster care while pursuing reintegration with the other two children. Mother told R.E.R. it was R.E.R.'s fault the children were in foster care. After determining the sessions were unproductive and Mother's negative attitude was harming R.E.R., Mac-Pherson discontinued family counseling. MacPherson told Mother family counseling

4

could resume once Mother obtained individual counseling. Mother never obtained individual counseling. MacPherson continued to have individual counseling with R.E.R. on an almost-weekly basis and testified R.E.R. improved dramatically after ceasing visits with Mother.

The State filed a motion for termination of parental rights in February 2017. The district court held a termination hearing in September 2017. Cynthia Moses, a social worker and licensed therapist at Transitions Counseling Services, testified she conducted an assessment of Mother in February 2017. Moses diagnosed mother with posttraumatic stress disorder, schizoaffective disorder (bipolar type), and borderline personality disorder. She testified these diagnoses could make a person feel like they are always the victim.

Moses recommended Mother attend the Victims Perpetrating Violence Program, which helps people understand how being a victim can cause them to become a perpetrator. Moses also recommended 30 sessions of Safe Kids because of how the children came into protective custody. Moses testified Mother made progress in her Victims Perpetrating Violence classes but she had not made much progress in Safe Kids because Mother failed to attend Safe Kids regularly. Mother's inconsistent attendance at Safe Kids and "chaotic life" concerned Moses. Moses testified the chaos stemmed from housing and employment instability. Mother also reported being off of her medications for short periods of time. Additionally, Moses testified Mother continued to maintain R.E.R. lied about the physical abuse.

Erin Wynger, a psychologist with KVC, testified she conducted a psychological evaluation and parenting assessment of Mother. Through the psychological evaluation, Wynger noted Mother had some difficulty with low intellectual functioning. She diagnosed Mother with other specified personality disorder with prominent borderline features. This is "basically borderline personality disorder," but Wynger needed more

information to make a full diagnosis of borderline personality disorder. Wynger recommended additional testing, individual therapy, and a drug and alcohol assessment. During the psychological evaluation, Mother reported she wished to relinquish her rights to R.E.R. and reintegrate with K.C.S. and R.L.S.

Stompoly testified about her involvement with Mother. She thought Mother had "directly negatively affected the children's placement on at least three occasions." Mother's interaction with the children during visits concerned Stompoly. Stompoly had not witnessed any positive change in Mother's parenting abilities, and never heard Mother understand or accept responsibility for the fact her children were in foster care. Mother was resistant to services and did not complete Safe Kids. When Stompoly recommended Mother go to Parent Management Training with MacPherson, MacPherson had to stop because it was not successful. When those sessions ceased, Stompoly offered Mother a referral to Parents as Teachers but Mother "said no because she felt like she was doing everything." Mother told Stompoly she did not feel like she had any problems and did not need any services.

Stompoly also testified Mother failed to complete several court orders and was not always truthful to caseworkers. Mother tested positive for multiple substances on her drug tests and had not provided a RADAC assessment. Mother did not have her own housing and was staying with her mother. Finally, Mother had not been truthful at two mental health assessments.

Stompoly also recommended a psychological evaluation of Mother after noticing Mother had difficulties remembering information like appointments and referrals. Stompoly tried to accommodate Mother's needs by texting her reminders about appointments and visits. Stompoly also tried to ensure Mother received one-on-one services as opposed to group services.

Mother testified at the hearing. She said she was currently living with her mother, but she had an apartment to move in to the following week. Mother also said she had been working at a home health care company and she had four pay stubs. Mother consistently maintained R.E.R. fabricated the physical abuse allegations. She said she did not complete a RADAC assessment because she was not asked to complete one. She also said she stopped participating in Safe Kids after Stompoly cancelled her visits with her children. Mother said she had been taking medication for depression, and she had been participating in individual therapy at Wyandot Center since the previous year.

The district court terminated Mother's parental rights. It found by clear and convincing evidence Mother was unfit by reason of conduct or condition which rendered her unable to care properly for her children, and the conduct or condition was unlikely to change in the foreseeable future.

ANALYSIS

On appeal, Mother claims "[t]here was not clear and convincing evidence that reasonable efforts were made to rehabilitate the family." When reviewing a district court's decision to terminate parental rights, the appellate court considers "whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that [the parent's rights should be terminated]." *In re B.D.-Y*, 286 Kan. 686, 705, 187 P.3d 594 (2008). Clear and convincing evidence requires the fact-finder to believe "that the truth of the facts asserted is highly probable." 286 Kan. at 697. The appellate court does "not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." 286 Kan. at 705.

Once a child has been adjudicated to be a child in need of care, parental rights may be terminated "when the court finds by clear and convincing evidence that the parent is

7

unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2017 Supp. 38-2269(a). The court may consider, but is not limited to, several factors listed in K.S.A. 2017 Supp. 38-2269(b) and (c). A finding of "any one of the . . . factors standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2017 Supp. 38-2269(f). If the district court "makes a finding of unfitness, the court shall consider whether termination of parental rights . . . is in the best interests of the child." K.S.A. 2017 Supp. 38-2269(g)(1).

Mother raises two points on appeal. She argues some of the professionals involved in the case thought she had difficulty with intellectual functioning and almost no accommodations were made in the reintegration plan to deal with that fact. She also suggests "[g]iven the progress . . . Mother had made on some of the court orders there was not clear and convincing evidence that she would not be in a position for the children to return home in the foreseeable future." She asserts her "failure to carry out the plan approved by the district court" was due "at least in part because of her low level of intellectual functioning and the failure to tailor the plan to her individual needs."

The evidence does not support Mother's claims. MacPherson testified Mother's "intellectual functioning was not the issue." Mother never told MacPherson she had trouble understanding or keeping up with what MacPherson was trying to teach her. MacPherson's conclusion was Mother just chose not to follow some of the recommended activities or act appropriately with her children. Stompoly noticed Mother was having issues remembering things they had talked about previously. She accommodated this by sending reminders to Mother regarding meetings and case plans. Stompoly also tried to ensure Mother received one-on-one services as opposed to group services. This likely helped Mother as she would have more opportunity to move at her own pace and ask questions if necessary. Mother failed to complete the court orders.

The district court found Mother was unfit pursuant to K.S.A. 2017 Supp. 38-2269(b)(1), (3), (7), and (8).

Under K.S.A. 2017 Supp. 38-2269 (b)(1), termination is appropriate if the parent's "[e]motional illness, mental illness, mental deficiency or physical disability [were] of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child." The record reflects the State's experts diagnosed Mother with personality disorders. Mother either resisted or refused to get mental health treatment. The experts acknowledged Mother completed two mental health assessments but doubt she was being honest through the process. Of concern was that Mother received disability benefits for bipolar disorder, and yet reported she suffered no mental illnesses. Mother also had an inpatient psychiatric stay for depression and anxiety. Individual therapy may have helped Mother, but getting therapy was one of her court orders she failed to comply with. Additionally, she never signed a records release for the Wyandot Center, thus denying her caseworkers the ability to evaluate her needs or progress. Mother did attend some family counseling sessions but MacPherson cancelled them until Mother received individual counseling because her actions were hurting R.E.R. Mother never completed individual counseling but did provide proof she attended three individual counseling sessions.

Termination is appropriate when "the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature [renders] the parent unable to care for the ongoing physical, mental or emotional needs of the child." K.S.A. 2017 Supp. 38-2269(b)(3). Under the district court's order and plan for reintegration, Mother was to submit to random drug tests. She failed to submit a single negative test. She also failed to complete a drug and alcohol assessment despite being encouraged several times. Mother denied to a case manager she had a drug problem. One of the reasons the State initiated this case was concern regarding possible cocaine use. Mother failed to acknowledge or address her drug issues or cooperate with the case managers.

9

"[F]ailure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family" is another reason for termination of parental rights. K.S.A. 2017 Supp. 38-2269(b)(7). The evidence shows the State made reasonable efforts to help rehabilitate the family, but Mother refused many of these efforts. The most notable evidence was the failure of family counseling. The family's case manager was concerned about interactions Mother had with the children during visits. Namely, Mother's favoritism toward K.C.S. and blaming R.E.R. for the children being in foster care. Instead of ceasing the visits, the State offered Mother an opportunity to participate in family counseling. However, KVC stopped family counseling until Mother went to individual counseling, and Mother refused to go. Mother attended some Safe Kids programs, but her attendance was sporadic and she did not make much progress. Mother also declined to participate in Parents as Teachers, maintaining she had no problems and did not need the services.

Finally, a "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child" and "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home" are factors the district court may consider when terminating parental rights. K.S.A. 2017 Supp. 38-2269(b)(8) and (c)(3). When considering these last two factors, the record reflects Mother failed to carry out court orders by making reasonable efforts to adjust her lifestyle to meet the needs of her children. Mother failed to attend individual counseling to work through her individual issues and to restart and complete family counseling. She failed to submit negative drug tests or complete a drug and alcohol assessment claiming she had no drug problem. She failed to obtain stable housing or income. Mother failed to sign a release for her mental health records or honestly complete a mental health assessment, which made it difficult for the State to determine and address her needs to get the children returned to her home. During the pendency of the case, Mother failed to show any improvement in her parenting skills.

The evidence reflects Mother failed to adjust her lifestyle to meet the needs of her children or to work the plan set up for reintegration as the State made reasonable efforts to rehabilitate her. When these factors are coupled with her use of drugs and her emotional or mental issues, all the evidence sufficiently supports the district court's decision to terminate Mother's parental rights to R.E.R., K.C.S., and R.L.S.; and that the termination is in their best interest.

Affirmed.